STATE OF MINNESOTA

HENNEPIN COUNTY

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type:  Other Civil

---

MEREDITH A. FRELS, individually and
on behalf of classes of similarly situated
individuals,

              Plaintiff,

v.

QWEST CORPORATION, a Colorado
corporation, ENHANCED SERVICES
BILLING, INC., a Delaware corporation
d/b/a ENABILL, and PAYMENTONE
CORPORATION, a Delaware corporation,

              Defendants.

Court File No.: _____

**SUMMONS**

DEMAND FOR JURY TRIAL

<u>CLASS ACTION</u>

---

## THE STATE OF MINNESOTA TO THE ABOVE-NAMED DEFENDANTS QWEST CORPORATION, ENHANCED SERVICES BILLING, INC., AND PAYMENTONE CORPORATION:

You are hereby summoned and required to serve on Plaintiff's attorney an Answer

to the Complaint, which is herewith served on you and which is on file in the office of the

Court Administrator of the above-named Court, within twenty (20) days after service of

this Summons on you, exclusive of the day of service.  If you fail to do so, judgment by

default will be taken against you for the relief demanded in the Complaint.

Civil cases are subject to Alternative Dispute Resolution processes as provided in

Rule 114 of the General Rules of Practice for the District Courts.  Alternative Dispute

Resolution includes mediation, arbitration, and other processes set forth in the rules.  You


SCANNED
JUN 21 2010

may contact the Court Administrator for information about these processes and about resources available in your area. Alternative Dispute Resolution does not affect your obligation to respond to the Summons and Complaint within twenty (20) days.

Dated: May 21, 2010                    LOCKRIDGE GRINDAL NAUEN P.L.L.P.


By:    _____
       Robert K. Shelquist (MN #021310X)
       Eric N. Linsk (MN #0388827)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:   (612) 339-6900
Fax:   (612) 339-0981
rkshelquist@locklaw.com
rnlinsk@locklaw.com

Myles McGuire
Michael McMorrow
Edelson McGuire LLC
350 North LaSalle Street, Suite 1300
Chicago, IL  60654
Tel: (312) 589-6370
Fax: (312) 589-6378
mmcguire@edelson.com

Jan Stuurmans
Law Offices of Jan Stuurmans, P.A.
276 Baker Building
706 Second Avenue South
Minneapolis, MN 55402
Tel:   (612) 336-4455
Fax:   (612) 336-4505
stuurmanslaw@aol.com

*Attorneys for Meredith A. Frels, individually, and
on behalf of classes of similarly situated individuals*

2

STATE OF MINNESOTA

HENNEPIN COUNTY

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type:  Other Civil

---

| | |
|---|---|
| MEREDITH A. FRELS, individually and on behalf of classes of similarly situated individuals, | Court File No.: _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| QWEST CORPORATION, a Colorado corporation, ENHANCED SERVICES BILLING, INC., a Delaware corporation d/b/a ENABILL, and PAYMENTONE CORPORATION, a Delaware corporation, | DEMAND FOR JURY TRIAL <br><br> CLASS ACTION |
| Defendants. | |

---

Plaintiff Meredith A. Frels ("Frels" or "Plaintiff"), by and through her undersigned attorneys, brings this class-action complaint against Defendants Qwest Corporation, Enhanced Services Billing, Inc., Enabill, and PaymentOne Corporation, on behalf of herself and all others similarly situated, based on Defendants' practice of charging telephone subscribers for services they never authorized. For her class-action complaint, Plaintiff alleges as follows on personal knowledge regarding herself and her own acts and experiences, and, regarding all other matters, on information and belief, including the investigation conducted by her attorneys:

## JURISDICTION & VENUE

1.     Plaintiff Meredith A. Frels is an individual residing in and a citizen of the State of Minnesota. Venue is proper under Minn. Stat. § 542 because Plaintiff's cause of action or some part thereof arose in this County.

2.     Defendant Qwest Corporation ("Qwest") is a Colorado corporation with its headquarters and principal place of business in Denver, Colorado. Defendant Qwest is one of the nation's primary landline telephone service providers. Qwest does business in Minnesota and this county, and committed the acts alleged herein, thus causing damage within Minnesota. This Court has personal jurisdiction over Defendant Qwest under Minn. Stat. §§ 543.19 and 303.13.

3.     Defendant Enhanced Services Billing, Inc. ("ESBI") is a billing processor, or "aggregator," that bills landline telephone consumers of national telephone carriers like Defendant Qwest for premium-content services provided by third parties. Premium content for landline telephones consists of, among other things, games, coupons, dieting tips, fax services, business advice, and other products and services. ESBI is a Delaware corporation with its headquarters and principal place of business in the State of Texas. It does business throughout the State of Minnesota and in this County. Upon information and belief, ESBI also does business under other corporate names, including Enabill. This Court has personal jurisdiction over Defendants ESBI and Enabill under Minn. Stat. § 543.

4.     Defendant PaymentOne Corporation ("PaymentOne") is a billing processor, or "aggregator," that bills landline telephone consumers of national telephone carriers

2

like Defendant Qwest for premium-content services provided by third parties. PaymentOne is a Delaware corporation headquartered in California. PaymentOne does business throughout the United States and in this County.

## FACTUAL BACKGROUND

5.      Today's telephones are far more complex instruments than the traditional landline-based telephones of the past. Instead of mere tools for sending and receiving telephone calls, modern telephones—both landlines and mobile phones—are increasingly used by consumers to transact commerce with third parties, much like a common credit card. This increased functionality allows telephone subscribers to purchase a vast variety of products and services provided by a rapidly growing industry of third-party vendors. These additional products and services are collectively referred to in the telecommunications industry as "premium content" telephonic services.

6.      For landline-telephone subscribers, premium content ranges from web-hosting products to email accounts, oral-email services, diet-monitoring services, and more.

7.      Telephone subscribers are not billed directly by these premium-content vendors. Instead, premium-content vendors use companies known as "aggregators"—essentially middlemen—to enable them to collect money from telephone subscribers.

8.      Aggregators serve as a conduit between the numerous, diverse, and comparatively small premium-content vendors as well as the large, national telephone carriers, such as Qwest, and facilitate the premium-content vendors' ability to: (i) use a national carrier's network to deliver their services to that carrier's subscribers; and/or (ii)

3

use a national carrier's billing system to collect payment for their premium-content services from that carrier's subscribers.   In return, the aggregators and the national carriers (e.g., Defendant Qwest) each keep a percentage of the premium-content charges.

9.      Defendants ESBI, Enabill, and PaymentOne are among such aggregators.

10.     ESBI was previously investigated by the Federal Trade Commission for illegally "cramming" unauthorized charges for a variety of services onto consumers' telephone bills, and in 2001 agreed to settle the charges by agreeing to refrain from placing unauthorized charges on consumers' phone bills.

11.     The premium-content industry generates vast revenue for all parties involved: the premium-content vendors, the aggregators, the national telephone carriers such as Defendant Qwest, and even the affiliate marketers.

12.     Not all of this revenue, however, has been legitimately and lawfully collected.  A primary source of the problem is the national telephone carriers' billing systems.

13.     Put simply, telephone carriers, including Defendant Qwest, have constructed billing systems with no checks to ensure that when an aggregator places a charge for premium content on one of its subscriber's bills, that subscriber actually desired the premium-content service and authorized the charge for the service.  Instead, an aggregator need only provide Qwest with a subscriber's name and telephone number in order to place a charge for premium-content services on that subscriber's bill.  The result is that an untold number of Qwest's subscribers have been charged for premium-

4

content services that they never authorized.  Because Qwest profits significantly, it has done nothing to remedy this flawed billing system.

14.     In contrast, a consumer who uses a check to make a transaction or purchase must sign that check to prove he or she has authorized payment.  Many merchants also require check users to produce an additional form of identification such as a drivers' license or state-issued ID.  An issuing bank then examines that signature to verify whether the consumer actually authorized payment.

15.     Similarly, a consumer who uses a credit card to make a transaction or purchase must provide, at a minimum, both the credit card number and date of expiration. And more often than not, a credit card user also must sign a receipt or, if the transaction takes place online, provide his or her three-digit credit card security code, the zip code of the credit card holder's billing address, and a matching street address. Credit card providers also have additional levels of security in place to analyze a consumer's particular transaction, based on the transaction's similarity to that consumer's previous transactions, to determine the likelihood of whether a particular transaction is the result of fraud or theft.

16.     In stark contrast to these general consumer payment methods, a premium-content vendor can bill a consumer for premium-content services once the vendor has the consumer's telephone number, even if the consumer never agreed to purchase the services or was never informed about the charges for such services.  The premium-content vendor only has to provide an aggregator with a cell phone or landline telephone number and the amount of the premium-content charges, and the aggregator simply

5

transmits that information to the national carrier (e.g., Defendant Qwest) to include on the telephone bill for that cell phone or landline telephone number.

17. Because the parties involved—including the premium-content vendor, the aggregator, and the national carrier—each keep part of every premium-content charge, they maintain this billing system despite knowing that large numbers of consumers are being billed for premium-content services the customers neither wanted nor authorized.

18. This problem is exacerbated because charges for premium-content services often are not clearly identified on subscribers' telephone bills, thereby making it impossible for subscribers to identify the origin or nature of the charges, or to distinguish the charges from the numerous other line-item charges and fees that appear on the average consumer's telephone bill. In addition, because charges for premium-content services are often only a few dollars, subscribers who have recurring third-party charges may fail to notice such charges, much less expect such charges to even appear on an ordinary telephone bill.

19. Defendant Qwest could easily stop this system by requiring aggregators to provide some form of proof that a subscriber did, in fact, purchase such premium content. One way to do this would be by providing each of its subscribers a unique code to use whenever making purchases of premium content, and by requiring all third parties to provide that same code to Qwest before allowing a third party to cause one of its subscribers to be charged. In addition, Qwest could provide on each subscriber's bill information as to (1) the party responsible for premium-content services charges; (2) a description of the premium-content service being charged for; (3) the method by which

the consumer allegedly purchased such service (i.e. via the internet, mail, or in person); and (4) the date on which the consumer allegedly purchased the service.

20.      Despite Defendant Qwest's ability to stop its unauthorized billing practice, it has purposefully maintained this system because it is a source of significant profit. However, the damage Qwest has caused to date pales in comparison to the damage that will occur if this system is not fixed, given the growth of the premium-content industry.

21.      Defendant Qwest has contracts with third-party providers which allow these third parties to bill and collect from Qwest's subscribers. Such charges go directly onto Qwest's subscribers' bills.

22.      The duty of good faith and fair dealing requires that Defendant Qwest not bill its subscribers for unauthorized services. However, Qwest regularly bills its subscribers for services that they neither wanted nor authorized.

23.      Defendant Qwest, on information and belief, has profited greatly through its system of unauthorized billing.

24.      Moreover, Defendant Qwest is fully aware that many of its subscribers claim they never authorized charges for premium-content services, and Qwest realizes that its billing system does not provide it with a method of verifying whether or not a subscriber did, in fact, authorize charges for premium content.

25.      Defendant Qwest's continued conduct in billing subscribers for premium-content services, combined with its failure to implement a billing system that would ensure only subscribers who did, in fact, authorize charges for such services were

7

actually billed for them, is a deliberate strategy by Qwest to unlawfully collect small sums from a large number of its subscribers.

26.     Defendant Qwest has in the State of Minnesota and in the United States registered numerous transactions and processed substantial sums of money in transactions over recent years and has profited greatly from its arrangements with aggregator partners and premium-content vendor partners.

27.     Defendants ESBI, Enabill, and PaymentOne have in the State of Minnesota and in the United States registered numerous transactions and collected substantial sums of money in transactions over recent years and have profited greatly from their arrangements with the national carriers and premium-content vendor partners.

28.     The rapid growth of the premium-content industry means that increasingly more consumers will be harmed by Defendants' unlawful conduct if such conduct is allowed to remain unchecked.

## FACTS RELATED TO NAMED PLAINTIFF

29.     Plaintiff Frels entered into a contract with Defendant Qwest for landline telephone service for her personal home use in or about 1988.

30.     Pursuant to that contract, Frels agreed to pay a monthly fee, in exchange for one of Defendant Qwest's landline telephone service plans, and Defendant Qwest assigned Frels a landline telephone number.

31.     Defendants caused Frels' telephone account to be charged for unwanted and unauthorized premium-content products or services.

8

32.     Specifically, between November 2008 and March 2009, Defendants caused Frels' telephone account to be charged a $14.95 monthly service fee for residential email services.  ESBI placed a charge for Enhanced Telecommunication Services on Frels' Qwest bill, described as a charge for "Residential Email."

33.     On April 25, 2009, Defendants caused Frels' telephone account to be charged for unauthorized content.     ESBI placed a charge for Enhanced Telecommunication Services on Frels' Qwest bill, described as a $14.95 monthly service fee for "Residential Email."  Enabill placed a charge on Frels' bill of $14.95 monthly service fee for content provider United Tel (FindYourDiet.com).

34.     On May 25, 2009, Defendants caused Frels' telephone account to be charged for unauthorized content.  PaymentOne.com placed a charge for Enhanced Telecommunication Services on Frels' Qwest bill, described as a $19.95 monthly service fee for content provider Priority ID.

35.     On June 25, 2009, Defendants caused Frels' telephone account to be charged for unauthorized content.     ESBI placed a charge for Enhanced Telecommunication Services on Frels' Qwest bill, described as a $14.95 monthly fee for content provider Intelicom Messaging.  PaymentOne.com placed a charge for $19.95 on Frels' Qwest bill, described as a monthly fee for "ID Protect" from content provider Priority ID.

36.     On July 25, 2009, Defendants caused Frels' telephone account to be charged for unauthorized content.     ESBI placed a charge for Enhanced Telecommunication Services on Frels' Qwest bill, described as a $14.95 monthly fee for

9

content provider Intelicom Messaging. PaymentOne.com placed a charge of $19.95 on Frels' Qwest bill, described as a monthly fee for content provider Priority ID.

37.     On August 25, 2009, Defendants caused Frels' telephone account to be charged for unauthorized content. Defendant Qwest billed Frels for $125.66, the unpaid balance for the unauthorized charges previously imposed and not paid by Frels.

38.     On or about October 2, 2009, Defendant Qwest caused Frels to receive a balance-due notice from a collection agency of $54.21, which upon information and belief is related to unauthorized charges previously imposed and not paid by Frels.

39.     On November 25, 2009, Defendant Qwest caused Frels' telephone account to be charged for unauthorized content. ESBI placed a charge for Enhanced Telecommunication Services on Frels' Qwest bill, described only as a $7.95 monthly fee for Callwave.

40.     Frels' November 25, 2009 Qwest bill also included "adjustments"—that is, credits—by ESBI for a previous unauthorized charge of $14.95 and a previous unauthorized charge of $19.99.

41.     On November 25, 2009, Defendant Qwest caused Frels' telephone account to be charged for unauthorized content. ESBI placed a charge for Enhanced Telecommunication Services on Frels' Qwest bill, described only as a $7.95 monthly fee for Callwave.

42.     On January 25, 2010, Defendant Qwest caused Frels' telephone account to be charged for unauthorized content. ESBI placed a charge for Enhanced

Telecommunication Services on Frels' Qwest bill, described only as a $7.95 monthly fee for Callwave.

43.     At no time did Frels authorize the purchase of these products or services.

44.     At no time did Frels authorize Defendants or anyone else to bill her for these charges.

45.     During the relevant period, Defendants caused Frels to be charged service fees for such premium-content services.

46.     At no time did Frels authorize or acquiesce to Defendants or anyone else to bill her for these premium-content charges.

47.     Defendants never attempted to verify Frels' alleged authorization of these charges.  Moreover, Defendants have not yet provided Frels a complete refund of the billed charges.  To the contrary, Defendants have caused a collection agency to send a balance-due notice to Frels for the unauthorized charges.   Defendants have not guaranteed Frels that she will not be billed for such unauthorized charges again.

## CLASS REPRESENTATION ALLEGATIONS

48.     Plaintiff brings this action on behalf of herself and a class consisting of all of Defendant Qwest's telephone subscribers in the United States who suffered losses or damages as a result of Defendants Qwest, ESBI, Enabill, and PaymentOne charging for premium-content products and services not authorized by the subscriber (the "Class"), and alternatively, a subclass of all Class members who reside in Minnesota (the "Subclass").

49.     This action has been brought and may be properly maintained as a class action pursuant to Rule 23 of the Minnesota Rules of Civil Procedure.

50.     **Numerosity of the Class – Minn. R. Civ. P. 23.01(a):** The members of the Class and Subclass are so numerous and geographically dispersed that joinder of all members of the Class would be impracticable. Members of the Class are located in the State of Minnesota and throughout the United States. The exact number of the members of the Class and Subclass is unknown to Plaintiff at this time, but can be obtained from Defendants' records. Plaintiff reasonably believes the Class numbers at least in the hundreds or thousands. Class and Subclass members can be notified of the pendency of this action by mail, supplemented by published notice, if necessary.

51.     **Existence and Predominance of Common Questions of Fact and Law – Minn. R. Civ. P. 23.01(b); 23.02(c):** There are many questions of law and fact common to the claims of Plaintiff and other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Additionally, there are many questions of law and fact common to the claims of Plaintiff and the other members of the Minnesota Subclass, and those questions predominate over any questions that may affect individual members of the Subclass. Questions common to the Class and Subclass include but are not limited to the following:

- Whether Defendants' conduct violated the Minnesota Deceptive Trade Practices Act and the Minnesota Consumer Fraud Act;

- Whether Defendants have unjustly received money belonging to Plaintiff and the Class and Subclass and whether principles of equity and good conscience dictate whether Defendants should be permitted to retain it;

- Whether Defendants are required to institute policies and procedures to ensure that premium-content services and charges have been authorized; and

- Whether Defendants are required to institute policies and procedures to ensure that premium-content services and charges can be cancelled upon request and refunds are available for any unauthorized premium-content services and charges.

52. **Adequacy – Minn. R. Civ. P. 23.01(d):**  Plaintiff is an adequate representative of the Class and Subclass because her interests are coincident with, and not antagonistic to, those of the Class and Subclass.  In addition, Plaintiff's counsel is experienced and competent in prosecuting complex class action litigation.  Plaintiff and her counsel are committed to prosecuting vigorously this action on behalf of the other members of the Class and Subclass, and have the financial resources to do so.  Neither Plaintiff nor her counsel has any interest adverse to the other members of the Class or Subclass.

53. **Typicality - Minn. R. Civ. P. 23.01(c):**  Plaintiff's claims are typical of the claims of the Class and Subclass because Plaintiff was charged by Defendants for "premium" telephonic products and services she did not authorize.

54. **Superiority - Minn. R. Civ. P. 23.02(a)(c):**  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  The damages suffered by individual Class and Subclass members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' conduct. Further, it would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them

individually. Even if Class members themselves could afford such individual litigation, the court system could not, given the size of the Class. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from the complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

55.     In the alternative, the Class may be certified pursuant to Minn. R. Civ. P. 23.02(a) or 23.02(b) because:

a.     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants;

b.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests; and

c.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## COUNT I
### Breach of Contract, on behalf of the Class
### (Against All Defendants)

56.     Plaintiff incorporates by reference the foregoing allegations.

14

57.     Frels and the Class entered into substantially identical Service Agreements with Defendant Qwest whereby Frels and the Class agreed to pay agreed-upon sums in return for Defendant Qwest's activation of their telephone accounts and Defendant Qwest's provision of communication services to Frels and the Class.

58.     Defendant Qwest expressly and/or impliedly agreed to bill Frels and the Class only for products or services they had authorized.

59.     Defendant Qwest breached its contractual obligations, including its contractual obligations of good faith and fair dealing, by thereafter billing Frels and the Class for services which were never authorized.

60.     Defendants ESBI, Enabill, and PaymentOne caused Qwest to breach its contractual obligations, including its contractual obligation of good faith and fair dealing, by instructing Qwest to bill Frels and the Class for services which were never authorized.

61.     The aforementioned breaches of contract have proximately caused Frels and the Class economic injury and other damages.

## COUNT II
### Conversion, on Behalf of the Class
### (Against All Defendants)

62.     Plaintiff incorporates by reference the foregoing allegations.

63.     During the class period, Defendants collected amounts of money from the Plaintiff and other class members for premium-content services charged to their telephone accounts.

64.     Plaintiff and other class members are entitled to a refund of the money, as the stated purpose for which Defendants collected the money was false.

15

65.     Plaintiffs and other members of the class are entitled to damages as a result
of Defendants' conversion.

### COUNT III
### Violation of Minn. Stat. § 237.665
### Prohibition Against Billing for Unauthorized Charges
### On behalf of the Minnesota Subclass
### (Against All Defendants)

66.     Plaintiff incorporates by reference the foregoing allegations.

67.     Defendant Qwest provided Plaintiff and the other Minnesota Subclass
members with local telephone service.

68.     Defendants charged Plaintiff and the other Minnesota Subclass members
for third-party content, as alleged elsewhere in this Complaint.

69.     Plaintiff and the other Minnesota Subclass members did not consent or
authorize these services. Defendants do not have any evidence that Plaintiff or the other
Minnesota Subclass members gave prior express authorization for those third-party
content services, as such evidence is defined under Minn. Stat. § 237.665(c).

70.     Per Minn. Stat. § 237.665(b), Plaintiff seeks on her behalf and on behalf of
all Minnesota Subclass members to have Defendants remove all such charges from their
respective bills and credit or refund any amounts paid for the unauthorized third-party
content services.

## COUNT IV
### Violation of Minn. Stat. § 325D.44, et seq.
### Minnesota Uniform Deceptive Trade Practices Act
### On behalf of the Minnesota Subclass
### (Against All Defendants)

71.     Plaintiff incorporates by reference the foregoing allegations.

72.     Defendants have committed two deceptive trade practices. First, Defendants failed to disclose to Plaintiff and the Minnesota Subclass that they would be charged for unauthorized third-party content services if they used Defendants' services. This trade practice violates Minn. Stat. § 325D.44(5) because Defendants represented that their services had characteristics, uses, and benefits it does not have. This trade practice also violates Minn. Stat. § 325D.44(13) because it otherwise creates a likelihood of confusion or of misunderstanding.

73.     Second, Defendants charged Plaintiff and the Minnesota Subclass for third-party content services without disclosing that such charges and services were unauthorized. This trade practice violates (a) Minn. Stat. § 325D.44(2) because it caused a likelihood of confusion or of misunderstanding as to the approval or certification of the third-party content services; (b) Minn. Stat. § 325D.44(5) because it represented that the third-party content services had approval, characteristics and benefits they do not have; and (c) Minn. Stat. § 325D.44(13) because it creates a likelihood of confusion or misunderstanding.

74.     Defendants engaged in such acts and omissions intending that Plaintiff and Minnesota Subclass members would rely on their misrepresentations and omissions.

17

75.     Defendants knew their practices were deceptive and willfully engaged in them.

76.     Pursuant to Minn. Stat. §§ 8.31 and 325D.45, Plaintiff demands for herself and the Minnesota Subclass that Defendants' unlawful conduct be enjoined and that they be entitled to recover their costs of investigation, attorneys' fees, allowable restitution and costs and disbursements resulting from the unlawful conduct alleged herein.

**COUNT V**
**Violation of Minn. Stat. § 325F.68** *et seq.*
**Minnesota Prevention of Consumer Fraud Act**
**On behalf of the Minnesota Subclass**
**(Against All Defendants)**

77.     Plaintiff incorporates by reference the foregoing allegations.

78.     Defendants' services and the third-party content services at issue in this Complaint are "merchandise" under the meaning of Minn. Stat. § 325F.68(2).

79.     Defendants did not disclose to Plaintiff and the Minnesota Subclass that they would be charged for unauthorized third-party content services if they used Defendants' services.   In addition, Defendants did not disclose to Plaintiff and the Minnesota Subclass that charges for third-party content services were unauthorized.

80.     These practices constitute fraud, misrepresentation, misleading statement or deceptive practice in connection with the sale of merchandise (as it is defined under Minn. Stat. § 325F.68(2)).

81.     Defendants engaged in these practices with the intent that Plaintiff and the Minnesota Subclass rely thereon in connection with the sale of merchandise. Defendants thereby violated Minn. Stat. § 325F.69.

18

82.     Under Minn. Stat. § 8.31, subd. 3a, Plaintiff seeks damages along with costs and disbursements, including costs for investigation and reasonable attorneys' fees, and any other equitable relief (including disgorgement, restitution, constructive trust, and an accounting) against Defendants for the violations of Minn. Stat. § 325F.69 alleged above.

**COUNT VI**
**Tortious Interference With Contract**
**On behalf of the Minnesota Subclass**
**(Against Defendants ESBI, Enabill, and PaymentOne)**

83.     Plaintiff incorporates by reference the foregoing allegations.

84.     Defendants ESBI, Enabill, and PaymentOne intentionally interfered, without privilege or justification, with the contracts between Plaintiff and the Class and Qwest, specifically causing Qwest to breach its contractual obligations, including its contractual obligation of good faith and fair dealing, and its obligation not to violate Minn. Stat. § 237.665 (Prohibition Against Billing for Unauthorized Charges), by instructing Qwest to bill Frels and the Class for services which were never authorized.

85.     The actions of Defendants ESBI, Enabill, and PaymentOne have been in willful and reckless disregard of Plaintiff's and the Class Members' rights under their contracts with Qwest.

86.     The interference of these Defendants with Plaintiff's and the Class Members' contracts with Qwest has caused Plaintiff and the Class Members to suffer financial damages in the form of unauthorized charges placed on their landline telephone bills; collection fees resulting from unpaid unauthorized charges; damage to their credit

19

ratings because of unpaid unauthorized charges; and such other expenses that Plaintiff and the Class Members may have incurred (such as for their own counsel) in connection with the unauthorized charges.

WHEREFORE, Plaintiff Meredith Frels, on behalf of herself and the Class and Subclass, prays for the following relief:

a.   Certify this case as a class action on behalf of the Class and Subclass as defined above and appoint Meredith Frels as Class Representative, and appoint the undersigned counsel as lead counsel;

b.   Declare that the actions of Defendants, as set out above, constitute a breach of contract and violate Minnesota state law, as set out above;

c.   Enter judgment against Defendants for all actual, monetary, economic, consequential, and compensatory damages caused by their conduct;

d.   Award Plaintiff and the Class exemplary damages if Defendants' conduct is proved willful;

e.   Order injunctive, declaratory, and equitable relief as necessary against Defendants to protect the interests of Plaintiff and the Class, including an injunction against continuing the acts alleged above, as well as disgorgement, restitution, constructive trust, and an accounting;

f.   Award Plaintiff and the Class reasonable costs and attorneys' fees; and

g.   Award any further relief as equity and justice may require.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: May 21, 2010

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By: _____

Robert K. Shelquist (MN #021310X)
Eric N. Linsk (MN #0388827)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:  (612) 339-6900
Fax:  (612) 339-0981
rkshelquist@locklaw.com
rnlinsk@locklaw.com

Myles McGuire
Michael McMorrow
Edelson McGuire LLC
350 North LaSalle Street, Suite 1300
Chicago, IL  60654
Tel: (312) 589-6370
Fax: (312) 589-6378
mmcguire@edelson.com

Jan Stuurmans
Law Offices of Jan Stuurmans, P.A.
276 Baker Building
706 Second Avenue South
Minneapolis, MN 55402
Tel:  (612) 336-4455
Fax:  (612) 336-4505
stuurmanslaw@aol.com


*Attorneys for Meredith A. Frels, individually, and
on behalf of classes of similarly situated
individuals*

21

## **ACKNOWLEDGMENT**

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorneys and witness fees may be awarded to the party against whom the allegations in this pleading are asserted pursuant to Minn. Stat. § 549.211.

Dated: May 21, 2010

_____
Eric N. Linsk (No. 0388827)

 CT Corporation

**Service of Process Transmittal**
05/21/2010
CT Log Number 516669092

**TO:**   Diane Barnes
Qwest Corporation
1801 California Street, Suite 900
Denver, CO 80202

**RE:**   **Process Served in Minnesota**

**FOR:**   Qwest Corporation (Domestic State: CO)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Meredith A. Frels, individually and on behalf of classes of similarly situated individuals, Pltf. vs. Qwest Corporation, etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Letter, Summons, Complaint, |
| **COURT/AGENCY:** | Fourth Judicial District Court, Hennepin County, MN
Case # None Specified |
| **NATURE OF ACTION:** | Violations of Minn. Stat. - On Prohibition Against Billing for Unauthorized Charges - On Minnesota Prevention of Consumer Fraud Act on behalf of the Minnesota Subclass |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System Inc., Minneapolis, MN |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 05/21/2010 at 11:35 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Eric N. Linsk
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
612-339-6900 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 05/21/2010, Expected Purge Date: 05/26/2010
Image SOP
Email Notification, Diane Barnes Diane.Barnes@qwest.com
Email Notification, Art Walker arthur.walker@qwest.com |
| **SIGNED:**
**PER:**
**ADDRESS:** | C T Corporation System Inc.
Deborah Van Ness
100 South Fifth Street
Suite 1075
Minneapolis, MN 55402 |
| **TELEPHONE:** | 612-333-4315 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.